## Louisville Times Company v. Emrich (two cases).

(Decided Oct. 27, 1933.)

(As Modified on Denial of Rehearing Jan. 19, 1934.)

CARY TABB and PETER, LEE, TABB, KRIEGER & HEYBURN for appellant.

LEO SANDMAN and JAMES BOSWELL YOUNG for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing in part and affirming in part.

Wm. Emrich recovered against the Louisville Times Company $2,000 compensatory and $50 punitive damages for libel; his wife, Mayme I. Emrich, made a like recovery, growing out of the same publication; and the Times Company has appealed.

From July 3, 1929, until June 11, 1931, Mr. and Mrs. Emrich resided at 1219 Homeview drive, in Louisville, Ky., in what appears to have been a one-story bungalow, which had been erected by a Mr. Monahan, and by him sold to James J. Mouser, from whom it was rented by one or both of the Emrichs, but whether to both or one and, if one, to which one, is not disclosed of this record.

About 1:30 a. m. June 11th fire was discovered in this house, and before it could be extinguished the roof and upper part of it were practically destroyed. The ravages of the fire disclosed two gable walls over the porch about 30 inches apart, thus making a sort of closet between them about 135 or 140 cubic feet in extent, the size of which will be more readily grasped by

considering that the average room contains between 2,000 and 3,000 cubic feet. This closet was at the end of an unfloored and unlighted attic, and, to reach it, it was necessary to coon the joists of the porch ceiling. This secret closet had been built and used for the storage of whisky by Mr. Mouser, the owner of the building, when he lived there. It would be practically impossible at any reasonable expense to construct a closet more cleverly concealed than this one, or one more difficult to find and less likely to be discovered. There was a small door opening into it, and the door and the means of opening and closing it were likewise well concealed. This closet and the roof above it were less damaged by the fire than any other of the upper parts of this building. After the fire, there was discovered in this closet a five-gallon stone jug, two paper cartons containing a number of empty half-pint bottles, such as are sometimes used for whisky, and in the main part of the attic there was found what looked like part of a burned stave from a keg or barrel, but no hoops, and a few other partly burned pint and half pint bottles, and in the ruins of the living room a five-gallon tin can. No liquor of any kind was found anywhere.

The Times Company had a picture made of what was left of the house, and this picture and a rather thrilling story appeared on the front page of the first four editions of the Times that afternoon, and almost the same story, but slightly softened, appeared in the last two issues. The original story and to some extent the revised story contained sensational mention of and references, both in the body of the article and in the headlines, to "Hidden whisky," "Secret plant," "Rum blaze," "Aging needle," "Closet containing the liquor," "Rum cache," "Whisky containers," etc. A reporter for the Times, who visited the place says he found no whisky there, and when he telephoned in the information upon which the article was written that he said nothing of any "Hidden whisky," or that there was any whisky there at all. He was asked about this part of the article: "The hidden closet containing the liquor was constructed under the roof." Of course, we do not know how much confusion he exhibited on the stand, but here is the way it looks in the record: "I think it was —is a misprint, more than anything else." It was perhaps charitable to call it a misprint, but not likely to

impress a jury, then considering the question, was it true?

This hidden closet is described in the article as opening into an unfinished room on the second floor, this reporter admitted on cross-examination, that it was at one end of an attic, and it had no other door to it opening into anything. The door opening into this closet from the attic was the only opening to this closet.

This article continues: "The electric aging needle is a device that works on the principle of an electric curling iron. It is a perforated tube of a composition material—" "The wires are connected to an ordinary electric cord and plug attachable to any light socket." Another position taken by the appellant is that there was whisky in this secret closet and the whisky became overheated, exploded, and was destroyed in the fire. It even proved there were two explosions, and it contends its article was substantially true. We will follow it to this position and see if there can be truth in it.

If it were the liquor in this closet that exploded, then the first fire, the most intense fire, the fire fed by the burning whisky, would have been in this closet, yet the very pictures which it introduced on the trial and the one it printed in its paper showed this closet to be the least injured part of this building. The bottles found in this closet were in paper cartons and the cartons were not destroyed. And as this reporter was pressed further on cross-examination he finally admitted there had been no flames in this secret closet.

Going back to the aging needle which the article described as a perforated tube of composition material, the Times Company calls attention to a short piece of pipe which was picked up in this attic after the fire, out of which it is now endeavoring to construct an aging needle. We examined this scrap of pipe (a little over four inches long), and when we did we found it has no hole or holes in it anywhere; it has not even one perforation. Mrs. Emrich describes a pipe formerly attached to the bath tub, a cheap arrangement by means of which a shower bath could be taken, which had given away, had fallen, and had been thrown into this attic to get out of the way, and the physical appearance of this piece of pipe shows so clearly that it was merely a piece of bath room plumbing that the effort of the Times

Company, to make the jury believe it was the remains of an aging needle perhaps hurt its case.

It may be fairly said that all reporter found was a jug, a tin can, a scrap of what appears to be brass pipe, some empty bottles, a secret closet, and that the rest of the story was largely imaginary. After the first issue of the paper appeared, about noon, the Times was called on the telephone, told the article was untrue, and Mr. and Mrs. Emrich asked for an interview and a retraction, neither of which was accorded them, and Mr. Emrich was told, "He had better get out from under the police," and the article was published in the five subsequent editions. The Times Company for defense relied upon the substantial truth of the article, and the jury found against it.

The intended effect of this article was to convey to the average reasonable reader the impression that this house was then being used for the illicit storage and manufacture or processing of whisky, and that in the aging of it a bit of carelessness in the use of an aging needle had caused the fire. The article was libelous per se (17 R. C. L. p. 279, sec. 20; 36 C. J. p. 1204, sec. 132).

The name of Mayme I. Emrich is not mentioned in the article. It charges neither of the Emrichs directly with any wrong, but does make such charges concerning the house and operations therein as to amount to a libel of the director of those operations, and, in the absence of proof that she leased the house or other evidence of her control, the presumption would be that her husband, Wm. C. Emrich, was responsible therefor. So complete is his control of his premises regarded that it has been held a wife cannot give consent to the search of a husband's premises for liquor. Veal v. Commonwealth, 199 Ky. 634, 251 S. W. 648; Duncan v. Commonwealth, 198 Ky. 841, 250 S. W. 101; Amos v. U. S., 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654. She is not responsible for his wrongdoing.

In U. S. v. Crossen (D. C.) 264 F. 459, it was held, in a case where a wife was keeping liquor in her residence, for her use and that of her guests, that it could not be seized, although the husband was using this residence as a saloon.

The illegal business this article was calculated to induce the average reasonable reader to believe was

conducted here was one from which the presumption would be the husband was responsible and not the wife. She must show she was defamed. It is put this way in 36 C. J. p. 1158, sec. 24:

"Defamatory words to be actionable must refer to some ascertained or ascertainable person, and that person must be plaintiff. If the words used really contain no reflection upon any particular individual, no averment can make them defamatory. It is not, however, necessary that plaintiff should be mentioned by name, if the words used in describing the person meant can be shown to have referred to him and to have been so understood by others.

"It is not necessary that all the world should understand that the charge referred to plaintiff, it is sufficient that those who know plaintiff can make out that he is the person meant, but the liability of defendant depends on whether the defamation was calculated from its intrinsic quality to lead other persons to believe that it referred to plaintiff."

One can defame a class, as will appear from section 26, p. 1161, of 35 C. J., and section 127, p. 375, of 17 R. C. L.

This article is a defamation of the party or parties presumed to be responsible for what was done in this house, and under the facts and the presumption of the husband's control Mrs. Emrich would not be included as a responsible party; hence she was not defamed. To defame a class, the libelous article must be applicable to every member of the class. The nearest approach to this we have found is Fenstermaker v. Tribune Publishing Co., 13 Utah, 532, 43 P. 112, 45 P. 1097, 35 L. R. A. 611, and that article refers to the family, whereas this one does not. Hence the Times Company was entitled to a directed verdict in Mrs. Emrich's case.

In the case of Mr. Emrich, the verdict is not excessive and we find no fault in the instructions. Both parties concluded the introduction of evidence on Tuesday, April 19th, and announced through. The next morning after the court had overruled the plaintiff's motions for a peremptory instruction, counsel for the Times made this statement:

"I wish to offer Mr. Homan J. Scott, whom I just met this morning, to testify in rebuttal with refer-

ence to the general reputation of Mr. and Mrs. Emrich in their neighborhood with reference to selling whiskey.''

The court heard Mr. Scott's testimony out of the presence of the jury and refused to allow it to go to the jury. This witness did not live in the neighborhood of the Emrichs; he did not even know their names. He began constructing a sewer in the neighborhood of this property in December, 1930. His proffered testimony was:

"There had been some whiskey around there, and I was asking where the stuff had been bought, and they told me up there at this house—on several occasions it was bought up there at this house.''

(The witness was referring to the Emrich house.) The witness said he had never bought any there, so his proffered testimony was the purest hearsay.

Evidence of a plaintiff's bad reputation, if he has such, is admissible in such a case as this, if for no other purpose, as bearing upon the issue of damages. 37 C. J. p. 97, sec. 537; p. 122, sec. 580; 17 R. C. L. pp. 451, 452, secs. 213, 214.

Was the proffered evidence admissible? A man's reputation is the regard or esteem in which he is held by his neighbors, his acquaintances and associates. It is in a way the composite hearsay about him. It is their estimate of him formed from their association with, observation of, and contact with him. It is his standing in public opinion in his community, where he has resided, and ordinarily the members of that community are the only proper witnesses to testify as to such. The rule is thus stated in 8 R. C. L. p. 210, sec. 205:

"The witnesses to character may not testify as to particular acts or even the course of conduct of the accused, but must confine themselves to a statement of his general reputation in the neighborhood wherein he has lived; and this rule applies as well to evidence in rebuttal as to original testimony.''

The proffered evidence does not meet these requirements, and the court did not err in refusing to admit it.

There is no merit in the defendant's contention that Mrs. Emrich should not have been allowed to testify

because her testimony would benefit her husband. She was a plaintiff in one of the cases, and of course in her case she had a right to be heard. If these cases had been tried separately, she could not have testified for her husband, but they were consolidated at the instance of the Times Company, and it cannot complain of a situation that it caused to exist.

The judgment is reversed in the case of Mayme I. Emrich, and affirmed in the case of Wm. C. Emrich.