Reggie WARFORD, Appellant,

v.

The LEXINGTON HERALD–LEADER COMPANY; and John S. Carroll, Individually, Appellees.

No. 89–SC–181–TG.

Supreme Court of Kentucky.

April 26, 1990.

Rehearing Denied June 28, 1990.

Elizabeth S. Feamster, Barry M. Miller, Fowler, Measle & Bell, Larry S. Roberts, Lexington, for appellant.

Robert F. Houlihan, Jr., James L. Thomerson, Stoll, Keenon & Park, Lexington, Edward O. Delaney, Kenneth H. Inskeep, Barnes & Thornburg, Indianapolis, Ind., for appellees.

LAMBERT, Justice.

Appellant Reggie Warford sued the Lexington Herald–Leader Company and editor John S. Carroll for defamation in the Fayette Circuit Court in 1986. The allegedly false statements of which appellant complained concerned published allegations of recruiting improprieties he committed in his capacity as assistant basketball coach at the University of Pittsburgh. The statements at issue originally appeared in the *Lexington Herald–Leader* in the fall of 1985, but were reprinted in 1986 in a special publication under the heading "NCAA Reprint" which was entitled *1985: A Year of Crisis in College Athletics*. The Reprint is the source of the libel alleged to be actionable.

After two years of discovery and pretrial hearings, this case was tried in early 1989. At the conclusion of appellant's case in chief, the trial court directed a verdict for appellees. Appellant filed a notice of appeal and we granted his motion for transfer.

Appellant was a student basketball player and team captain at the University of Kentucky. Following his graduation from UK, he became an assistant basketball coach at Iowa State University. Among other duties, appellant recruited players. In 1980, appellant was hired as an assistant

coach at the University of Pittsburgh by Coach Roy Chipman. Chipman testified that appellant was hired in part for his recruiting ability, as well as for his knowledge of the game. While appellant was not the chief recruiter, he was expected to produce commitments from talented high school players, as were the head coach and other assistant coaches. Chipman nearly fired appellant in 1983 because he was somewhat disorganized and ineffective in his recruiting efforts, but gave him another chance for the upcoming year.

One of appellant's prospects in 1984 was an outstanding Kentucky basketball player named Steve Miller. Miller was interviewed in 1985 by a reporter from the *Lexington Herald–Leader* about his career and the experience of being recruited for college basketball. Miller stated that appellant attempted to secure his commitment to play basketball at Pittsburgh by offering to share the benefits of the raise appellant anticipated if Miller signed. The *Herald–Leader* published the following in one of a series of articles about the "crisis in college athletics."

"Steve Miller, a heavily recruited forward from Lexington's Henry Clay High School, said that assistant coach Reggie Warford of the University of Pittsburgh offered to split some money with him. Warford "said that if he signed the top player out of Kentucky that he would have a raise and that I would benefit from that raise also," Miller said.

Warford, a former University of Kentucky player, acknowledged that he told Miller that signing him "would be a recruiting feather in my hat." But he denied offering Miller any money.

Miller went to Western Kentucky University instead."

Although appellant's denial of the allegations was printed in the October, 1985 story, Miller's prompt retraction of his statement was not disclosed when the story appeared in the Reprint.

The January, 1986 Reprint contained the 1985 news stories, editorials and other columns, as well as a nationwide chronology of events related to violations of NCAA rules. It also included the following summary.

"Steve Miller, now at Western Kentucky, told the newspaper that Pitt assistant coach Reggie Warford offered him money."

The Reprint was sent to the president, athletic director, faculty representative, and head football and basketball coaches at each member university, as well as 100 major newspapers across the country.

Based upon the Reprint, in the latter part of 1986, appellant sued for defamation. The statute of limitations had run on any claim he may have had based on the original article. During discovery, appellant filed a Motion for Partial Summary Judgment and requested a determination as to whether he enjoyed the status of a private, as opposed to a public figure for First Amendment purposes. Appellees had raised a defense to the complaint that appellant was a public figure and would be required to prove "actual malice" by the newspaper in publishing the story, rather than negligence. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The trial court found "from the record, existing at the time of submission, that the plaintiff is not a public figure." Based on the definition of public figures set forth in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the trial court considered appellant's role in the public controversy concerning recruiting violations in college athletics and it found that appellant occupied a minor role in recruiting at Pittsburgh. Moreover, it found that there was no recruiting controversy at Pittsburgh when appellant was hired. Finally, the court determined that appellant neither thrust himself into other controversies nor tried to influence controversies that arose during his tenure.

The Court entered its opinion on this issue in January, 1988. Discovery proceeded toward the January, 1989, trial date. Late in November, 1988, appellees moved the trial court to reconsider its previous ruling on the public versus private figure question. Upon a more fully developed

record, the trial court reversed its earlier ruling.

Although the trial court still relied upon *Gertz, supra,* it appears to have reinterpreted the public controversy requirement of the *Gertz* test for determining who is a public figure. On reconsideration, the court rejected the notion that the absence of a specific public controversy at Pittsburgh precluded a finding that appellant was a public figure. Instead it found that in light of Pittsburgh's Division I status in the NCAA, "the public controversy requirement of Gertz is met by the existence of the nationwide controversy regarding the recruitment of college athletes."

As to the appellant's involvement in the controversy, the trial court found his reputation as a recruiter at a major Big East Conference school significant. "Through his position and recruiting activities the plaintiff has voluntarily injected himself into the public controversy surrounding the recruiting of college athletes." Thus, shortly before trial, appellant was found to be a public figure for the limited purpose of comment on his recruiting activities.

At the conclusion of appellant's case in chief, the trial court directed a verdict on the grounds that insufficient evidence of actual malice had been presented to permit submission of the case to the jury. This appeal followed.

Three issues are before the court on this appeal and are as follows:

1) Did the trial court err in holding that appellant is a public figure for the limited purpose of comment on his actions as a college basketball recruiter?

2) Did the trial court err in ruling that appellant failed to present sufficient evidence of actual malice to support a jury verdict?

3) Did the trial court improperly admit evidence of acts unrelated to the defamatory publication?

## I. PUBLIC V. PRIVATE FIGURE

Appellant contends that he cannot be deemed a public figure under the standards adopted by the United States Supreme Court in the line of cases beginning with *Gertz v. Robert Welch, Inc.* Not surprisingly, appellees defend the trial court's interpretation of *Gertz* and other cases. This issue cannot be meaningfully addressed without a review of the relevant decisions of the United States Supreme Court. At the outset we note that the decision as to whether a plaintiff is a public figure is a question of law. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C.Cir.1980), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *see Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).[1]

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court recognized constitutional protection for speech and press in libel actions brought by public officials. It held that the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment:

> "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

*Id.* 376 U.S. at 279–80, 84 S.Ct. at 726. The Court stated explicitly the rationale underlying its decision in the following often-quoted passage:

> "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, ..." *Id.* 376 U.S. at 270, 84 S.Ct. at 721.

Three years after *New York Times v. Sullivan,* the Court extended the actual malice standard beyond public officials to include public figures. *Curtis Publishing*

---

1. We do not decide whether the trial court acted properly in deciding the question of law without submitting the evidence to the jury for findings of fact. *See Yancey v. Hamilton,* Ky., 786 S.W.2d 854 (1989).

Co. v. Butts and *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Wallace Butts (*Curtis Publishing Co. v. Butts, supra*) was the athletic director at the University of Georgia at the time the *Saturday Evening Post,* owned by the Curtis Publishing Co., published an article accusing Butts of conspiring to "fix" a 1962 football game between Georgia and the University of Alabama. He was formerly Georgia's football coach, was well-known among coaches, and was negotiating for a position with a professional team when the allegations were published. In the companion case, Edwin Walker (*Associated Press v. Walker, supra*) was an outspoken opponent of federal intervention by physical force in school desegregation actions and was alleged in a published report to have encouraged violence among rioters protesting James Meredith's court-ordered enrollment at the University of Mississippi in 1962.

The plurality opinion turned to ordinary tort principles to determine the plaintiffs' status as public figures. Finding that "both Butts and Walker commanded a substantial amount of independent public interest at the time of the publications," *id.,* 388 U.S. at 154, 87 S.Ct. at 1991, the plurality held that Butts had the status of public figure by position alone, while Walker by purposeful activity had thrust his personality into the vortex of an important public controversy. *Id.,* 388 U.S. at 155, 87 S.Ct. at 1991. The opinion also noted that both had "sufficient access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of the defamatory statements." *Id.* (reference omitted).

A short while later, in *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality of the Court further extended the actual malice standard by holding that it applies to publications about private individuals who become involved in events of public interest.

In an apparent retreat from the broad event-oriented position taken in *Rosenbloom* and in an effort to achieve a consensus, the United States Supreme Court decided *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the decision which forms the foundation of our analysis of the issue now before this Court.

In *Gertz,* a prominent Chicago lawyer had agreed to represent the family of a murder victim in civil litigation against the police officer who killed the youth. In a John Birch Society publication, attorney Gertz was subsequently branded a criminal, a Communist and a co-conspirator in a campaign to discredit local law enforcement agencies. A defamation action followed and the trial court found in favor of the defendant. The Court of Appeals for the Seventh Circuit affirmed based on its reading of *Rosenbloom,* which it held to require application of the *New York Times* standard whenever the publication concerned an issue of significant public interest, regardless of the position or notoriety of the plaintiff. On review, the Supreme Court recognized its inability to reach agreement on why the *New York Times* privilege applied in *Rosenbloom,* and further commented that the five separate opinions in *Rosenbloom* "reflect divergent traditions of thought about the general problem of reconciling the law of defamation with the First Amendment." *Gertz,* 418 U.S. at 333, 94 S.Ct. at 3008. The Court commented,

"Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury [by defamatory falsehood]." *Id.,* 418 U.S. at 342, 94 S.Ct. at 3008.

Nevertheless, the Court rejected an *ad hoc* resolution of competing interests in each particular case and set out broad rules of general application for use by lower courts to obtain more predictable results.

As a threshold distinction, the Court focused on types of defamation plaintiffs, as opposed to just the subject matter of the defamatory statement, which was held determinative in *Rosenbloom.* Recognizing that private individuals enjoy less access to the media than do public officials and public figures and are therefore less capable of

redressing reputational injury by rebuttal in the press, the Court found a substantial state interest in protecting private persons. *Id.*, 418 U.S. at 344, 94 S.Ct. at 3009. The Court said,

"We hold that, so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.*, 418 U.S. at 347, 94 S.Ct. at 3010.

In response, we held in *McCall v. Courier–Journal & Louisville Times Co.*, Ky., 623 S.W.2d 882, 886 (1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982), that simple negligence was the standard of liability necessary to "adequately [protect] the private individual from defamation." However, to recover punitive damages, the law requires even a private individual to show actual malice. *Gertz*, 418 U.S. at 349, 94 S.Ct. at 3011. "Punitive damages may be recovered only if the plaintiff shall allege and prove publication with legal malice...." KRS 411.051.

The Court in *Gertz* also noted a key distinction between public and private plaintiffs.

"More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case." *Id.*, 418 U.S. at 344, 94 S.Ct. at 3009.

Public figures as well as public officials assume the risk of closer public scrutiny. *Id.* at 345, 94 S.Ct. at 3009.

Public figures were identified in two principal subcategories. The Court said,

"Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare.

For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009.

By its public figure classification, the Court spawned a substantial body of caselaw. *See generally*, Annotation, "Libel and Slander: Who is a 'Public Figure' in the Light of *Gertz v. Robert Welch, Inc.*," 75 ALR3rd 616 (1977, and 1989 supp.); *Restatement (Second) of Torts*, § 580A reporter's notes (1977, 1987, 1989 supp.).

The Court further recognized that public figures may exist who are not easily classified as either general purpose public figures or limited purpose public figures.

"Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an 'influential role in ordering society.'" *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3010. (reference omitted.)

Nevertheless, upon analyzing Gertz's status as a public figure, the Court returned to its two-part classification.

"*That designation* [public figure] *may rest on either of two alternative bases:* In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. *More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited*

*range of issues.* In either case such persons assume special prominence in the resolution of public questions." *Id.,* 418 U.S. at 351, 94 S.Ct. at 3012–13. After its exhaustive analysis and despite Gertz's extensive professional and community activities and his several published books and articles, the Court did not determine that he was a general purpose public figure.

"We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.,* 418 U.S. at 352, 94 S.Ct. at 3013.

To determine whether Gertz was a limited purpose public figure, the Court considered his minimal role at the coroner's inquest and his lack of involvement in the criminal prosecution of the police officer.

"Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Id.*

From the foregoing, the Court concluded that Gertz was not a public figure for First Amendment purposes. We have engaged in a lengthy recitation of the law applied in *Gertz* not only because it is the seminal case controlling the *standards* we must apply to determine whether appellant was a public figure for any purpose, but also because the *method* for analysis guides us as it guided the United States Supreme Court in three subsequent decisions, to be discussed *infra,* relevant to our inquiry here.

There is no contention that appellant is a public figure for all purposes. If he is to be considered a public figure for a limited purpose under *Gertz,* we must decide, as a matter of law, whether in the broadest sense appellant thrust himself to the forefront of a particular public controversy in order to influence the resolution of the issues. The factors to be considered in making this determination, including appellant's access to the media, have been developed and refined in subsequent decisions from this nation's highest court. We now undertake a review of these decisions.

In *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the Court studied the public controversy requirement. Asked to apply the *New York Times* standard of recovery in a libel suit by a socialite against the publisher of *Time* magazine, the Court declined.

The publisher had argued that Mrs. Firestone was a public figure because her divorce was a "cause *célèbre,*" and thus a public controversy. The Court rejected this argument relying on its definition of public figure as established in *Gertz v. Robert Welch, Inc., supra,* as follows:

"respondent did not assume any role of especial prominence in the affairs of society, ... and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." *Firestone,* 424 U.S. at 453, 96 S.Ct. at 965.

Moreover and significantly, the Court refused to reinstate the *Rosenbloom* doctrine by extending the *New York Times* privilege to statements about any controversy of a general public interest. A public controversy cannot be equated "with all controversies of interest to the public." *Id.,* 424 U.S. at 454, 96 S.Ct. at 965.

The last two Supreme Court decisions to be revisited were rendered on the same day. In *Wolston v. Readers' Digest Association, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the plaintiff sued the publisher of a book on Soviet spies in which Wolston was listed as a Soviet agent. Although he had never been indicted for espi-

onage, his aunt and uncle were convicted on such charges. Wolston was the subject of a flurry of newspaper articles concerning his failure to appear, despite being subpoenaed to do so, before a special grand jury impanelled to investigate Soviet intelligence agents. He did eventually appear and pled guilty to a contempt charge.

Reversing the court below, which had determined the plaintiff to be a public figure who failed to prove actual malice on the part of the publisher, the Court again relied on its decision in *Gertz.* The rationale for extending the *New York Times* rule to public figures, it explained, was two-fold. First, public figures enjoy greater access to the media, and are thus better able to redress injury from defamatory statements through self-help by rebuttal.

"Second, and more importantly, was a normative consideration that public figures are less deserving of protection than private persons because *public figures,* like public officials, *have 'voluntarily exposed themselves to increased risk of injury from defamatory* falsehoods concerning them.'" *Wolston,* 443 U.S. at 164, 99 S.Ct. at 2705–06 (reference omitted, emphasis added).

The two subcategories of public figures, all purpose and limited purpose, were identified as the "two ways in which a person may become a public figure for purposes of the First Amendment." *Id.* Finding that Wolston did not qualify as a public figure for all purposes, the Court also rejected the lower court's findings that he had thrust himself to the forefront of a public controversy for a limited purpose by failing to comply with a subpoena ordering him to appear before a grand jury.

The Court's analysis proceeded according to its now settled pattern. Wolston had not voluntarily thrust himself into a public controversy. "It would be more accurate to say that petitioner was dragged unwillingly into the controversy." *Id.,* 443 U.S. at 166, 99 S.Ct. at 2707. Moreover, the Court assumed the existence of a public controversy only for the sake of argument. "It is difficult to determine with precision the 'public controversy' into which petitioner is alleged to have thrust himself. Certainly there was no public controversy or debate in 1958 about the desirability of permitting Soviet espionage in the United States, all responsible ... citizens understandably were and are opposed to it." *Wolston,* 443 U.S. at 166 n. 8, 99 S.Ct. at 2707 n. 8.

As to Wolston's voluntary actions, the Court did not find his failure to appear before the grand jury decisive. Considering the "nature and extent of [the] individual's participation in the particular controversy," the Court noted that it had decided in *Gertz* that an attorney who voluntarily associated himself with a case certain to attract significant media attention was not a public figure. *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707. Similar to the facts in *Gertz,* Wolston never discussed the grand jury matter with the press, and he played only a minor role in any existent controversy over Soviet espionage investigation.

Further, the Court next rejected the mere newsworthiness of the plaintiff's failure to appear before the grand jury as conclusive of the public figure issue.

"A private individual is not automatically transformed into a public figure just by becoming involved or associated with a matter that attracts public attention." *Id.,* 443 U.S. at 167, 99 S.Ct. at 2707.

Finally, Wolston did not engage "the attention of the public in an attempt to influence the resolution of the issues involved." *Id.,* 443 U.S. at 168, 99 S.Ct. at 2707. The Court observed that a person could precipitate a contempt citation in order to create public discussion of investigative methods, but concluded that such was not the case in *Wolston. Id.*

The final U.S. Supreme Court decision of critical importance herein is *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). Ronald Hutchinson was a behavioral scientist who succeeded in obtaining a National Science Foundation (NSF) research grant for studying objective measures of aggression in primates. In 1975, the NSF was awarded U.S. Senator William Proxmire's Golden Fleece Award for egregious wasteful spending for

its funding of Hutchinson's research into "jaw-grinding and biting by angry or hard-drinking monkeys." Senator Proxmire's defamatory statements in the Senate were published in newsletters sent to constituents. Hutchinson sued. The U.S. District Court found Hutchinson to be a public figure who had not met his burden of showing actual malice.

Reciting the litany of libel decisions beginning with *New York Times v. Sullivan,* the Court focused on the *Gertz* definition of a public figure for a limited purpose. The court below had held that Hutchinson was not a public figure because: 1) he had successfully applied for federal funds, and this fact had been reprinted in the local newspapers, and, 2) he had access to the media, as shown by the fact that his response to the Golden Fleece Award announcement was reported in some newspapers and wire services. The Supreme Court said:

> "Neither of those factors demonstrates that Hutchinson was a public figure *prior to the controversy* engendered by the Golden Fleece Award; his access, such as it was, came after the alleged libel." *Hutchinson,* 443 U.S. at 134–35, 99 S.Ct. at 2688 (emphasis added).

As to Hutchinson's status as a grant recipient, the Court observed that his public profile was not particularly outstanding and his published writings reached only a limited audience.

> "To the extent the subject of his published writings became a matter of controversy, it was a consequence of the Golden Fleece Award. Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making a claimant a public figure." *Hutchinson,* 443 U.S. at 135, 99 S.Ct. at 2688.

Further, Hutchinson had not thrust himself or his views into a public controversy in order to influence others, nor had he assumed a role of public prominence in the controversy. In fact, once again the Court was unable to grasp the nature of the particular controversy. The general public concern about public expenditures was not sufficiently particularized to have made Hutchinson a public figure. *Id.* The Court rejected a subject matter classification which would categorize all federal research grant recipients as public figures.

> "The 'use of subject matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area.'" *Id.* at 135, 99 S.Ct. at 2688 (citing *Time v. Firestone,* 424 U.S. at 456, 96 S.Ct. at 966).

Finally, Hutchinson's ability to respond to the Golden Fleece Award did not constitute "the regular and continuing access to the media that is one of the accoutrements of having become a public figure." *Id.,* 443 U.S. at 136, 99 S.Ct. at 2688.

■ Considering the *Gertz* factors and analysis as applied by the U.S. Supreme Court in its decisions culminating in *Hutchinson,* we will take the following approach to determining appellant's status as a public figure. We must first look to a point in time before the defamatory statements generated their own controversy and ask: (1) in what particular and identifiable public controversy (2) did appellant by some voluntary act involve himself to the extent that he either assumed a role of public prominence, or was in a position to influence others or the outcome of the controversy, and (3) did appellant enjoy regular and continuing access to the media? [2] De-

---

2. *See Clark v. American Broadcasting Cos., Inc.,* 684 F.2d 1208 (6th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792.
> "First, a 'public controversy' must exist. Second, the nature and extent of the individual's participation in the particular controversy must be ascertained." *Id.* at 1218 (references omitted.)
> "The nature and extent of an individual's participation is determined by considering three

factors: first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy." *Id.*
Compare *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (DC Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

spite applying this consistent set of criteria, the Supreme Court has weighted the significant factors differently in specific cases. We too shall comply with the *Gertz* admonition to look "to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.*, 418 U.S. at 352, 94 S.Ct. at 3013.

### a. *Public Controversy*

The Fayette Circuit Court found the existence of

"... *a general public controversy ... concerning the proper recruitment of athletes in college sports.* This public controversy is a real dispute, the outcome of which not only affects the general public but more obviously colleges in general and more specifically universities heavily involved in sports.

As a school belonging to the prestigious Big East Conference and a member of Division I of the National Collegiate Athletic Association (NCAA), the University of Pittsburgh is an example of a university heavily involved in sports and consequently in the highly competitive recruiting of high school athletes. With such status, therefore, *we find that the public controversy requirement of Gertz is met by the existence of the nationwide controversy regarding the recruitment of college athletes."* *Warford v. Knight Ridder Newspapers, Inc.,* No. 86–CI–4251 (Fayette Circuit Court, Jan. 5, 1989) (final summary judgment) [hereinafter "Summary Judgment"] at 3.

Appellant does not dispute the factual underpinnings of the trial court's ruling on the public controversy requirement. Instead, he asserts the controversy identified lacks the specificity or particularity which the Supreme Court and other federal courts have required. We agree.

■ The "nationwide controversy regarding recruitment of college athletes" is too general a statement of a public controversy to be the axis of debate. *Cf. Wolston v. Reader's Digest,* 443 U.S. at 166 n. 8, 99 S.Ct. at 2707 n. 8 ("no public controversy or debate in 1958 about desirability of permitting Soviet espionage in the United States"), *Barry v. Time, Inc.,* 584 F.Supp. 1110, 1116 (N.D.Cal.1984) ("little or no dispute that violation of NCAA rules was improper"). Certainly, in 1985 there was no legitimate controversy or debate about the desirability of NCAA rules violations.

The First Amendment protects the "principle that *debate on public issues* should be uninhibited, robust, and wide open." *New York Times v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 721 (emphasis added). Newsworthy though NCAA recruiting violations at the University of Pittsburgh may have been, public interest alone does not create a public controversy, nor does it create a public figure. *Wolston v. Reader's Digest,* 443 U.S. at 167, 99 S.Ct. at 2707; *Time v. Firestone,* 424 U.S. at 454, 96 S.Ct. at 965. A general public concern about recruiting violations, like the general public concern about wasteful public expenditures is not sufficient to qualify a grant recipient or assistant basketball

---

"As the first step in its inquiry, the court must isolate the public controversy." *Id.* at 1296.

"Once the court has defined the controversy, it must analyze the plaintiff's role in it. Trivial or tangential participation is not enough. The language of *Gertz* is clear that plaintiffs must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution. They must have achieved 'a special prominence' in the debate. The plaintiff either must have been purposely trying to influence the outcome or could realistically have expected, because of this position in the controversy, to have an impact on its resolution." *Id.* (references omitted).

"Finally, the alleged defamation must have been germane to the plaintiff's participation in the controversy." *Id.* at 1298.
A slightly different formulation of the *Gertz* test was set forth in *Lerman v. Flynt Dist. Co., Inc.,* 745 F.2d 123 (2d Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985).

"A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Id.* at 136–37.

coach as a public figure if neither is surrounded by a specific controversy. *See Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2688.

We reject the use of "subject matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods." *Id.* Consequently we cannot agree with the trial court that because the University of Pittsburgh enjoys the status of an NCAA Division I school which is highly competitive in recruiting athletes for its sports programs, the *Gertz* public controversy requirement is met by the existence of a general public concern over recruitment of college athletes.

Appellees argue that *Gertz* does not require a narrowly defined controversy, but if we disagree, they suggest we may nevertheless rely on a speculative finding of a local controversy by the trial court as follows:

> "In the case at bar, evidence was presented that a specific controversy regarding recruitment *may have* existed during the plaintiff's tenure at the University of Pittsburgh. We, however, do not believe that we must find a specific controversy, such as was found in *Barry*, at the University of Pittsburgh during the tenure of the plaintiff in order to find that the plaintiff is a limited public figure." Summary Judgment at 3.

In deciding that a local public controversy was not necessary to meet the public controversy requirement, the trial court rejected the holding in *Barry v. Time*, 584 F.Supp. 1110 (N.D.Cal.1984). We find the *Barry* court's approach instructive in analyzing the public figure question before us. Furthermore, the factual contrasts help to explain the different result we achieved in the case at bar.

In *Barry* the University of San Francisco's head basketball coach, Peter K. Barry, was accused in a *Sports Illustrated* article of involvement in NCAA recruiting violations. Barry sued for libel, but the issue of his status as a public figure arose before trial. Unlike appellant, Barry had been hired as *head* coach for the specific purpose of cleaning up USF's basketball program, which was investigated in previous years by both the NCAA and the university for alleged recruiting improprieties. The record in this case fails to reveal that a similarly charged atmosphere prevailed at the University of Pittsburgh at the time appellant accepted employment there.

The *Barry* court found Barry to be a limited purpose public figure. It began its analysis of the public figure controversy question by turning to a definition set out in *Waldbaum, supra.*

> "To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. *Id.* The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Id.*, 627 F.2d at 1297.

Applying the *Waldbaum* definition, the *Barry* court identified the qualifying public controversy as follows:

> "the public controversy involved the alleged recruiting violations at USF prior to Barry's acceptance of the position of head basketball coach." *Barry*, 584 F.Supp. at 1116.

The Court found that the outcome of the controversy could be expected to have a significant impact on the USF community by affecting the university's reputation. Then the Court clarified the exact nature of the controversy.

> "Moreover, although there may have been little or no dispute that violation of NCAA rules was improper, there certainly was a dispute as to what the university should *do* about allegations of recruiting violations." *Id.* at 1116.

Having narrowed the basis for debate to what USF and Barry should do about the allegations, the Court enlarged the affected public necessary in the *Waldbaum* definition by linking the precise controversy to "the larger public debate over the proper role of athletic programs at institutions of higher learning." *Id.* at 1116–17. The Court ultimately relied on *both* the local and national controversies to meet the public controversy requirement of *Gertz.*

"This court finds that the 'public controversy' requirement of *Gertz* is met in the present case by the existence of the specific controversy at USF surrounding the NCAA investigations of the athletic department, and by the intimately related nationwide controversy over the proper role of athletics at institutions of higher learning. This public controversy affects the lives of a large number of people." *Id.* at 1117.

At Pittsburgh, there was no particular or ongoing controversy with which to link the general recruitment issue or controversy; thus, we cannot conclude that appellant was involved in a particular and identifiable public controversy. The Fayette Circuit Court was unable to determine that a specific controversy existed at Pittsburgh prior to appellees' publication. And there was no particular finding of a local controversy over recruiting at Pittsburgh when the defamatory statements were published.

Accordingly, we hold that the public controversy requirement of the *Gertz* test has not been met.

#### b. *Involvement*

Appellees have urged us to return to the "compelling normative consideration underlying the distinction between public and private defamation plaintiffs," recognized in *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009, to evaluate appellant's involvement in the public concern. They claim that the significant question in this case has always hinged on appellant's acceptance of the risk of closer public scrutiny. Appellees would diminish the Supreme Court's emphasis on the primary manner in which individuals accept this risk in order to become limited purpose public figures. Typically, they

"... thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009.

Instead, appellees claim that it is irrelevant that appellant never publicly spoke out on recruiting issues and did not enjoy name recognition or a prominent position in college basketball coaching. They assert that when an individual voluntarily becomes involved in an activity which he knows is the subject of intense public scrutiny, he becomes a public figure for purposes of comment on his actions.

The trial court found that appellant's reputation as a recruiter had attracted head coach Chipman to hire him at Pittsburgh, and that he was heavily involved in recruiting.

"Through his position and recruiting activities the plaintiff has voluntarily injected himself into the public controversy surrounding the recruiting of college athletes, and that he assumed the risk that negligent defamatory remarks will be made about him."

The court went on to calculate that as an assistant coach and major recruiter at a Big East school, which was a Division I member of the NCAA, Warford had thrust himself into the public controversy surrounding college athletics.

Appellees rely on several distinguishable cases as authority. In *Rosanova v. Playboy Enterprises,* 580 F.2d 859, 861 (5th Cir.1978), the plaintiff, found to be a public figure, had been "the subject of published newspaper reports and other media reports" of his associations with and activities in organized crime *before Playboy Magazine* referred to him as a "mobster." In *Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072 (3rd Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985), the plaintiff was an attorney who had gained notoriety by representing and associating with motorcycle gangs and was subsequently indicted on federal drug charges *before Penthouse*

published an article in which he was alleged to be an attorney criminal consort with drug traffickers. The court found that based on his voluntary associations with the gangs and the intense media attention he engendered, Marcone was a limited purpose public figure. But it was a "close case." *Id.* at 1086. We do not view appellant's notoriety to be of the same caliber as Rosanova's or Marcone's.

Appellees refer us to other sports figure cases, none of which are binding on this court. In addition to *Barry, supra,* we have considered *Chuy v. Philadelphia Eagles Football Club,* 431 F.Supp. 254 (E.D. Pa.1977), *aff'd* 595 F.2d 1265 (3rd Cir.1979), in which a professional football player sued for defamation based on a published report that he had a debilitating disease. His condition and the report were related to a contract claim he was also pursuing against his employer. The court concluded Chuy was a public figure based on his starting position with the Philadelphia Eagles, his well-publicized trade from Los Angeles, and the publicly sustained injury which triggered his contract dispute. *Holt v. Cox Enterprises,* 590 F.Supp. 408 (N.D. Ga.1984) involved a highly unusual fact situation, which, briefly stated, sheds no light on appellant's public figure status. A professional jockey was accused of throwing a race at the Meadowlands in *Gomez v. Murdoch,* 475 A.2d 622 (N.J.Super.1984). The court found the plaintiff, a six year veteran, to be a public figure for a limited purpose because as a professional jockey, he chose "to perform publicly in a sport which commands widespread interest, and regarding which the communications media regularly report." *Id.* at 625. Both *Chuy, supra,* and *Gomez* relied on the public prominence assumed by professional athletes during their playing careers. As an assistant university basketball coach, appellant did not assume the type of prominence that head coaches presiding over controversial sports programs or professional athletes on the field attain.

We agree with appellees that the heart of the issue before us is whether appellant's employment was such that he accepted or assumed the risk of public scrutiny.

We conclude that he did not. We cannot ignore the way in which the United States Supreme Court has itself applied the *Gertz* test, by "looking to the nature and extent of an individual's participation in the particular controversy." *Id.,* 418 U.S. at 352, 94 S.Ct. at 3013. In *Gertz,* the Court held that an attorney with extensive professional and community activities to his credit, who voluntarily associated himself with a case certain to attract media attention, was *not* a public figure. *See Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707.

> "He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013.

If *Gertz* did not thrust himself into the vortex of controversy by assuming the representation of a controversial plaintiff in the narrowly drawn controversy surrounding the civil and criminal liability of police officers who shoot citizens, it is inconsistent to characterize an assistant basketball coach's recruiting activities at the University of Pittsburgh as the means by which he thrust himself into the public concern surrounding recruiting. This is particularly true in view of the fact that at the time appellant was hired, Pittsburgh had an unexceptional basketball program and competed in the Eastern Eight Conference, which enjoyed less recognition than the Big East Conference which Pittsburgh joined several years later.

In *Firestone,* the Court considered whether the plaintiff had assumed a role of special prominence in the affairs of society or had thrust herself to the forefront of a particular controversy in order to influence the outcome of the issues and concluded she had not. *Id.,* 424 U.S. at 453, 96 S.Ct. at 964. The Court found Wolston's participation in any possible controversy to be involuntary and his role to be minor if indeed there was a controversy. *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707. Further, Wolston did not attract public attention in order to influence the resolution of the issues. *Id.* at 168, 99 S.Ct. at 2707. Finally, in *Hutchinson,* the Court again found

the plaintiff's failure to thrust himself into a public controversy to influence the outcome of the issues, as well as his failure to assume a role of public prominence in the controversy significant in concluding Hutchinson was not a public figure.

From the foregoing, we must conclude that Warford did not assume the risk of defamation to the extent or in the manner contemplated by the Supreme Court in *Gertz* and its progeny. His recruiting activities at a Division I NCAA school are not sufficient to accord public figure status.

### c. *Media Access*

Appellant's access to the media for post-defamation rebuttal did not rise to the level of the regular and continuing access enjoyed by public figures. *Hutchinson*, 443 U.S. at 136, 99 S.Ct. at 2688. The fact that appellant received occasional press attention, or that one can reasonably speculate that *if* the local media decided to publish an article on some nationwide recruiting controversy, a reporter might ask appellant for his views does not imply that he could just as easily have insisted his views be published.

For the foregoing reasons, we hold that appellant was a private figure at the time of the alleged defamation.

### II. EVIDENCE OF ACTUAL MALICE

Appellant's second allegation of error concerns the trial court's judgment directing a verdict in favor of appellees on the grounds that appellant had not demonstrated actual malice by clear and convincing evidence. On retrial, appellant, as a private figure, will not be required to show actual malice in order to establish appellees' liability. *McCall, supra,* 623 S.W.2d at 886. However, if appellant succeeds in proving liability under the simple negligence standard, he must show actual malice in order to recover punitive damages. *Gertz, supra,* 418 U.S. at 349, 94 S.Ct. at 3011. KRS 411.051.

To show actual malice, a plaintiff must prove by clear and convincing evidence that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times, supra,* 376 U.S. at 279–80, 84 S.Ct. at 726. The Supreme Court recently recapped the actual malice standard in *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. ——, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

> "Actual malice ... requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of 'reckless disregard' 'cannot be fully encompassed in one infallible definition,' *St. Amant v. Thompson,* 390 US 727, 730, 20 L.Ed.2d 262, 88 S.Ct. 1323 [1325] (1968), we have made clear that the defendant must have made the false publication with a 'high degree of awareness of probable falsity,' *Garrison v. Louisiana,* 379 US 64, 74, 13 L.Ed.2d 125, 85 S.Ct. 209 [215] (1964), or must have 'entertained serious doubts as to the truth of his publication,' *St. Amant, supra* [390 U.S.] at 731, 20 L.Ed.2d 262, 88 S.Ct. 1323 [1325]." *Harte–Hanks,* 491 U.S. at ——, 109 S.Ct. at 2685, 105 L.Ed.2d at 576.

To determine whether to submit appellant's proof of actual malice to the jury, "the trial judge in disposing of a directed verdict motion should consider whether a reasonable fact finder could conclude ... that the plaintiff had shown actual malice with convincing clarity." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

> "Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate ... question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.,* 477 U.S. at 255–56, 106 S.Ct. at 2514.

The trial court in the case at bar has heretofore decided that the evidence would not support a reasonable jury finding that appellant has shown actual malice by clear and convincing evidence. We disagree.

From our de novo review of the factual record in full, as required by *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), and *Harte–Hanks, supra*, 491 U.S. at ——, 109 S.Ct. at 2696, 105 L.Ed.2d at 589, we hold the evidence could support a finding of actual malice upon the basis that appellees must have entertained serious doubts as to the truth of their published charge that appellant offered money to Steve Miller. The relevant evidence pertains to a subjective determination of the appellee's state of mind. *Harte–Hanks*, 491 U.S. at ——, 109 S.Ct. at 2678, 105 L.Ed.2d at 562; *Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). "[P]roof of the necessary state of mind could be in the form of objective circumstances from which the ultimate fact could be inferred." *Herbert v. Lando*, 441 U.S. at 160, 99 S.Ct. at 1640. However, "unless liability is to be completely foreclosed, the thoughts and editorial processes of the alleged defamer would be open to examination." *Id.* In *NCAA v. Hornung*, Ky., 754 S.W.2d 855 (1988), we held that "... malice may be inferred from a lack of probable cause in a malicious prosecution action."

█ Appellant presented conclusive evidence that appellees' made minimal efforts to verify Steve Miller's credibility. The reporters testified that they did not contact Miller's parents, friends, coaches or anyone else in whom he might have confided, in an attempt to check out the source of their story. Appellant testified that upon being confronted with the allegation shortly before the story's original publication, he asked reporter Michael York to check out specific sources, including Miller's parents. No one at the University of Pittsburgh, including Coach Chipman, was contacted prior to the October publication. No further investigation was conducted prior to the Reprint, despite the denials of appellant and others. While the failure to investigate before publishing is not sufficient to establish reckless disregard, *Harte–Hanks*, 491 U.S. at ——, 109 S.Ct. at 2678, 105

L.Ed.2d at 562, we view it as probative of malice when viewed cumulatively with other the evidence presented by appellant.

Appellees admitted they were aware of the gravity of the charge and potential harm to appellant. The defamatory publication was sent to all of his possible future employers in college basketball. This knowledge of potential harm should have heightened appellees' investigative efforts. The fact that it did not may be considered as evidence of malice. *Carson v. Allied News Co.*, 529 F.2d 206, 211 (7th Cir.1976); *Goldwater v. Ginzburg*, 414 F.2d 324, 339 (2d. Cir.1969), *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).

Appellees argue that their failure to investigate was vindicated by the fact that at trial appellant called none of the people he claims appellees should have interviewed prior to publication. They also assert that the evidence supported their decision not to believe Miller when he publicly retracted the statements about appellant shortly after publication. Whatever may have transpired after the fact is not controlling, the issue is state of mind at the time of publication.[3]

Appellees' reporters' story outlines included the Warford item as early as August and September of 1985. Despite this, appellant was not questioned about the allegations until October, just before the article was first published. Appellees admitted there was no time deadline motivating their failure to investigate or delay in confronting appellant. From the foregoing, a jury could reasonably believe that appellees were committed to running the story without regard to its truth or falsity.

Finally, we consider the characterization by appellees of Steve Miller's statement to the reporter.

"Then I was told that I would be treated nice by the alumni, you know, if—he said if he signed the top player out of Kentucky, uh, that he would have a raise and, you know, that I would benefit from the raise also. So, you know." Plaintiff's Exhibit 19A at 14.

**3.** The trial court did not reach the issue of falsity in appellant's libel action.

In a follow-up interview the next day, Miller repeated his claim and then the following exchange occurred:

> "YORK Sure. You really didn't get down to specifics? He didn't say well if you came, my raise would be x amount of dollars and you'd get your know, half of it or a third of it? He didn't get down to that I expect?
>
> MILLER Naw. Uh-huh (negative).
>
> YORK Did you get any feel for what he was talking about? Whether he meant like a hundred dollars or a thousand dollars or five thousand dollars?
>
> MILLER I was really kind of hesitate [sic] about talking about that because if I got to talking dollars and cents with him, then he would get the idea that at the right price, I could be bought to go to that school or whatever, so I didn't really get into that.
>
> YORK Uh-huh. I understand. I understand. That makes, uh, that makes perfect sense. But do you feel like that was definitely what he was talking about?
>
> MILLER Yeah. You know, just common sense on my part." Plaintiff's Exhibit 20A at 3–5.

From these ambiguous statements by Miller, appellees reported the following:

> "Steve Miller ... told the newspaper that Pitt assistant coach Reggie Warford offered him money." NCAA Reprint at 14.

In addition to inadequately investigating the truthfulness of Miller's accusation, appellees' construction in favor of the most potentially damaging alternative of the ambiguous statement made against Warford, exaggerating the charge, "creates a jury question on whether the publication was indeed made without serious doubt as to its truthfulness." *Rebozo v. Washington Post Co.*, 637 F.2d 375, 382 (5th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 504, 505, 70 L.Ed.2d 379 (1981). In view of all of the evidence presented during appellant's case in chief, we hold the trial court erred in directing a verdict for appellees on the issue of actual malice. Upon retrial, if the evidence presented is substantially the same and the jury finds for appellant, the issue of actual malice should be submitted.

### III. EVIDENCE OF OTHER MISCONDUCT

In his final allegation of error, appellant asserts the trial court erred when it permitted the introduction of evidence of separate specific acts of alleged misconduct by him and others. Testimony was admitted which concerned the participation of so-called "recruiting aides" Patti Eyster and Irvin Stewart. Appellant was alleged to have arranged an after-school job with Eyster for Miller through which to funnel improper gifts of money from Pittsburgh alumni. Stewart was a summer league coach who was also said to be assisting appellant in recruiting Miller by improper means.

In overruling appellant's motion *in limine*, the trial court held that any "bad acts" related to Miller's recruitment were relevant to show appellant's motive in offering Miller money. The court observed that the improper use of recruiting aids could show appellant's willingness "to step over the line" to recruit Miller.

■ Appellant contends this evidence was not admissible for the purpose of proving the truth of the defamatory publication due to the distinction between specific and general libel. Here, appellant was accused of the specific act of offering Miller money, as opposed to the general charge of having a corrupt disposition. Therefore, the truth of the accusation could not be proven by other specific bad acts. "There is a well-settled rule that the defendant may not justify this sort of charge by showing the plaintiff has committed other wrongful acts." 1A J. Wigmore, *Evidence in Trials at Common Law*, § 70.1 at p. 1488. (Tillers Rev., 1983). *See also Campbell v. Bannister*, 79 Ky. 205, 2 Ky.L.Rptr. 72 (1880); *Restatement (Second) of Torts*, § 581A, comment e and f.

Appellees counter that the other acts were "inextricably tied" to the ultimate issue of truth. Further, despite the general rule prohibiting evidence of other acts or conduct to prove a propensity toward mis-

conduct, they claim the evidence was admissible to prove motive, identity, knowledge, scheme or plan. R. Lawson, *The Kentucky Evidence Law Handbook*, § 2.20(c), at 38–39. Appellees cite *Holdaway Drugs, Inc. v. Braden*, Ky., 582 S.W.2d 646 (1979), where we held that evidence that the plaintiff was a drug user should be admitted to show motive in a defamation action. The plaintiff had worked in a drugstore, but was discharged for suspected theft of a controlled substance. His employer told him of his suspicions in the presence of other employees, and plaintiff sued. We said that on retrial,

> "the 'drug user' evidence should be admitted as relevant evidence whose probative value is not outweighed in the circumstances presented in this case by other elements which would permit its exclusion." *Id.* at 651.

The pertinent circumstances were that the plaintiff had been permitted to introduce evidence that the store owner's daughter was a drug user and had been barred from the store.

We are not convinced that appellant's use of "recruiting aids," if he did so use them as alleged, is probative on the issue of motive. While it may be reasonable to infer that if a person uses drugs, he might steal drugs, it is not reasonable to infer that appellant's enlistment of Eyster and Stewart to help recruit Miller was his motive for offering Miller part of his raise. The same desire or motive would seem to underlie both an offer of financial benefits and use of improper recruiters. While it may be reasonable to infer that "one step over the line" suggests a propensity, or at least a willingness, to break NCAA rules again, such is precisely the type of prejudicial evidence we cannot allow.

The general rule is well stated as follows:

> "'evidence of other acts, even of a similar nature, of the party whose own act or conduct ... is in question ... is not competent to prove the commission of a particular act charged against him, *unless the acts are connected in some special way*, indicating a relevancy beyond mere similarity in certain particulars.'" *Massie v. Salmon*, Ky., 277 S.W.2d 49, 51 (1955).

■ In the absence of a special connection between the other alleged bad acts which warrant their admission, the Eyster and Stewart incidents are not admissible on the issue of malice, because appellees were unaware of these other acts at the time the defamatory statement was published. Thus, the other acts could not have contributed to appellees' belief in the truth of Miller's allegations. The evidence of specific acts was not admissible in mitigation of damages. *Daugherty v. Kuhn's Big K Stores*, Ky.App., 663 S.W.2d 748, 750 (1983); *Register Newspaper Co. v. Stone*, 31 Ky.L.Rptr. 458, 102 S.W. 800, 801 (1907). Nor were specific acts admissible to show appellant's character. *Daugherty*, 663 S.W.2d at 750. While character evidence may be admissible, in theory, in a defamation action where "character" is made an issue in the pleadings by the defendant's defense of truth, R. Lawson, *supra* at § 205, the evidence must pertain to general reputation and not to particular acts. *Louisville Times Co. v. Emrich*, 252 Ky. 210, 66 S.W.2d 73 (1933).

To the extent that the Eyster and Stewart evidence was relevant to the jury's understanding of the reasonableness of Miller's belief that appellant offered him money, the probative value of this evidence was far outweighed by its potential for prejudice. Upon retrial, the evidence concerning improper conduct by "recruiting aids" Patti Eyster and Irvin Stewart should be excluded.

For the foregoing reasons, the judgment of the Fayette Circuit Court is reversed and this cause remanded for retrial.

All concur.