E. W. SCRIPPS COMPANY, Vance Trimble, and Jim Blair, Appellants,

v.

Donnie CHOLMONDELAY, a minor, by and through his mother and next friend, Janet Carter, and Janet Carter, Individually, Appellees.

Court of Appeals of Kentucky.

May 26, 1978.

As Modified June 20, 1978.

Rodney S. Bryson, Ware, Bryson, Nolan, West & Hiltz, Covington, Bruce W. Sanford, C. Michael Deese, Baker, Hostetler & Patterson, Cleveland, Ohio, for appellants.

Ronald R. Parry, Jolly, Johnson, Blau & Parry, Newport, for appellees.

Before HOWERTON, LESTER and WHITE, JJ.

HOWERTON, Judge.

This appeal arises from a libel judgment by the Kenton Circuit Court, jointly against the appellants, a publishing company, its editor and a reporter. The jury awarded the appellee $32,500.00 for compensatory damages, and $100,000.00 for punitive damages.

On April 18, 1974, the appellee, Donnie Cholmondelay (hereinafter referred to as Donnie), age 12, and Jeff Girdler (hereinafter referred to as Jeff), age 11, got into a fight. As Jeff proceeded to raise himself off the ground, Donnie hit him on the head. Apparently, this one blow caused Jeff to go into a coma, and to die approximately one year later. On April 29, 1974, an article about Jeff and the incident, which was written by appellant, Jim Blair, (hereinafter referred to as Blair), appeared in the *Kentucky Post.* The article stated that Jeff had been hit repeatedly on the head. Five months later, on September 21, 1974, another article, which was the object of this libel action, appeared in the *Post.* This article stated that Jeff's head had been pounded over and over again against the pavement, and that Jeff had been savagely beaten into insensibility. Donnie's name was never mentioned in either article.

Appellants allege a number of trial court errors, but we must first decide whether the libelous article should be classified as libel per se, or libel per quod. When that question is decided, we will either have accepted or disposed of most of appellants' alleged trial errors.

■ Appellants contend that the article was libelous per quod, because it did not name the plaintiff. Their reasoning is that if any extrinsic evidence is needed to prove

libel, then the article is libelous per quod, and special damages must be pleaded and proved. One interpretation of "per se" and "per quod" refers, respectively, to whether a defamatory statement is made on the face of the article, or whether extrinsic facts must be pleaded to explain that the statement is defamatory. If extrinsic facts must be supplied, then it is said innuendo must be pleaded, and the article is libelous per quod. The other interpretation is that a defamatory article is libelous per se, if it refers to a loathsome disease, a crime, unchastity in a woman, or a business or trade. When the defamatory statement does not name the defamed person, that person must prove that the article refers to himself. *Louisville Times Co. v. Emrich*, 252 Ky. 210, 66 S.W.2d 73 (1933). This is called "colloquium." Colloquium is not a part of innuendo, and therefore it does not affect whether the defamatory statement is per se or per quod. *Curtis v. Iseman*, 137 Ky. 796, 127 S.W. 150 (1910). In the case, *sub judice*, the article said that an older boy pounded Jeff's head against the pavement, and that Jeff was "beaten into insensibility." No extrinsic facts are needed to show that the statement is defamatory. Donnie's friends and acquaintances who were familiar with the incident were certain to recognize Donnie as the unnamed perpetrator of the offense. Therefore, we conclude that the article was libelous per se.

■ Because the article was defamatory per se, appellants' argument that the reasonably prudent editor and publisher were not warned of the article's defamatory potential is without substance. Further, appellants' argument that the appellee had to prove legal malice, according to KRS 411.051, and special damages is without merit.

■ In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the court held that when a private individual is defamed, the individual states have a legitimate interest in protecting the private individual's reputation by applying the state's own standard of liability. The

trial court, in the instant case, instructed the jury that:

If you believe from the evidence that the statements contained in the article published by the *Kentucky Post* on September 21, 1974, were false, and that the defendants were negligent in investigating, researching, reporting and publishing the article, then the law is for the plaintiff, and you shall so find.

We believe this was a correct statement of Kentucky law as to compensatory damages for libel. Furthermore, appellants' tendered instruction on this issue is substantially similar to the trial court's instruction. Having studied the record, we conclude that there was substantial evidence of negligence on the part of appellants, so that the jury could have awarded compensatory damages without specific proof for each and every item of special damages.

■ Next, appellants contend that the article was substantially true. The evidence at trial was that the victim was hit once in the head, as the boys were wrestling on the grass. Blair's description that the boy was savagely beaten is something more than poetic license. There was certainly substantial evidence for the jury to find that the article was false.

■ Also, appellants ask us to reverse the compensatory and punitive damage awards because they are so outrageously excessive as to shock the judicial conscience. *Tilley v. Bell*, Ky., 479 S.W.2d 901 (1972). It is sufficient to quote the trial court in its order denying a judgment notwithstanding the verdict. It stated:

No actual monetary damages were proven by the plaintiff. Due to remarks being made to him, and harassment at home, the boy went to his grandfather's home in Mason, Ohio, where he attended school and did poorly. He also received some counseling, although the nature of the counseling was not made clear. Eventually, his mother and stepfather moved to Cincinnati, Ohio, where they now make their home. Unquestionably, the move was caused by the public reaction to the incident wherein the Girdler

boy died. What were the actual damages sustained by plaintiff? This court thinks it to be self-evident that the plaintiff's reputation was injured, as well as his standing in the community. He was personally humiliated and suffered a certain degree of mental anguish, as evidenced by the precipitous decline in his school work.

We believe the trial court was correct in not finding the award for compensatory damages excessive.

We need not decide the issue of excessive punitive damages because we believe the trial court erred by refusing to direct a verdict for the appellants on the question of actual malice and punitive damages. The trial court refused to eliminate the issue of punitive damages because the judge concluded that there was a "wide disparity between the testimony of the plaintiffs and the defendants, and the court does not feel that it should interpose its judgment in this matter. . . ." Looking at the whole record, however, we do not believe the appellees presented any evidence of actual malice. The disparity referred to was between the testimony of Blair and the Police Chief, Mr. Webster, and Mrs. Girdler, the victim's mother. Having been told by the victim's sister, Charlene Girdler, that her brother had been hit repeatedly on the head, Blair testified that he attempted to verify this story by talking to the Police Chief and Mrs. Girdler, and that they supported his story that Jeff's head had been pounded against the pavement. Both Chief Webster and Mrs. Girdler admitted talking to Blair, or to someone from the newspaper, but they denied telling Blair that Jeff had been savagely beaten, or that his head had been pounded against the pavement. It does not appear in the record that either witness gave Blair much detail about what took place during the incident. Furthermore, it does not appear from the record that Blair received any contradictory facts to what he had been told by Charlene Girdler, and the rumor he had heard. Therefore, even if we disregard all of Blair's testimony about his efforts to verify the

story, there is no testimony that shows that Blair was aware of any falsity. One reason for Blair's problem in verifying the story was that the incident involved juveniles, so the police would not make the report public.

After the September 21st article had appeared, the appellee's mother had requested of Blair that he print a retraction. Blair agreed to print her side of the story. However, the story was not printed because all parties thought it would just add to the appellee's problems. It should be noted that as far as the accuracy of the report of the incident is concerned, the first article on April 29th was also false in that it reported that Jeff was repeatedly struck on the head. No one attempted to correct Blair on his facts, and he never learned otherwise until after the second story.

In *Gertz, supra*, the court held that while the states may impose their own standard of liability for compensatory damages, the states may not allow punitive damages unless actual malice is proven. "Actual malice" has been defined as "knowledge of falsity or reckless disregard for the truth." *Gertz, supra*, 418 U.S. at 349, 94 S.Ct. at 3012. The court thereby held that for a private individual to recover punitive damages, he must meet the same burden of proof, actual malice, as a public official must meet to receive compensatory damage awards. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the court wrestled with the term "actual malice" in its relationship to a reckless disregard for the truth. The court concluded that, "[r]eckless disregard . . . cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards." 390 U.S. at 730, 88 S.Ct. at 1325. The court's opinion also provided, ". . . [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *Id.* at 731, 88 S.Ct. at 1325.

Appellant's attempt to verify his story, which he had received in part from Charlene Girdler, his basic extension of the unchallenged first story after Jeff had remained in a coma for five months, and his readiness to write another article giving the appellee's side of the story are not examples of reckless disregard for the truth, nor do they indicate that Blair knew the story was false. The circumstances show more of a compassion for Jeff and his family, rather than any malice. Nowhere in the record is it stated that Blair was told what actually happened. While Blair's reporting may not have met the proper standards for a journalist, we do not believe that his reporting was so reckless as to be malicious.

Because the record has not indicated any substantial evidence of actual malice on the part of appellants, we believe the trial court should have directed a verdict for appellants on the issue of punitive damages.

Therefore, we affirm the judgment as to the compensatory damages, but we reverse the judgment as to the punitive damages.

All concur.