92 F.3d 1185
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Andrew G. GLOGOWER, Plaintiff-Appellant,
v.
PULITZER BROADCASTING CO. d/b/a WLKY-TV Channel 32; Bruce
Dunbar, Defendants-Appellees,
Patrick Watts, Defendant.
 No. 95-5108.
 United States Court of Appeals, Sixth Circuit.
 Aug. 2, 1996.
 
 Before: MILBURN and BOGGS, Circuit Judges; and BORMAN, District Judge.*
 MILBURN, Circuit Judge.
 
 
 1
 Plaintiff Andrew G. Glogower appeals the jury verdict for defendants Pulitzer Broadcasting Company and Bruce Dunbar in this diversity action for defamation and false light. On appeal, the issues are (1) whether the district court erred in its instructions to the jury regarding fiduciary duty and the substantially true rule, and (2) whether the jury verdict was against the weight of the evidence. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 In 1982, plaintiff Andrew G. Glogower purchased a third party administration from an insurance business in Louisville, Kentucky. The assets of the business were then transferred to Glogower's newly formed company, National Benefit Administrators, Inc. ("NBA"). In functioning as a third party administrator, NBA provided administrative services such as investigating, processing, and paying claims for several self-insured employee health care plans. These plans are known as "welfare benefit plans" under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq. NBA was paid a monthly fee based on a per capita charge for each covered employee.
 
 
 3
 NBA compensated Glogower pursuant to an August 1, 1982 employment agreement which set Glogower's salary at $150,000 per year plus an additional 10% per year. In the beginning, NBA had few clients and could not afford Glogower's salary but carried his unpaid salary forward as an account payable. Glogower was not compensated in 1983 or 1984. He was never paid his full salary until 1989.[1] In 1989, Glogower was paid $991,700. He was paid $303,100 in 1990. The increased compensation was due to NBA's increased profits from one of its clients, the Mid-America Soft Drink Bottling Trust ("Mid-America").
 
 
 4
 Mid-America was a multiple employer health care trust comprised of employers in the bottling industry. Mid-America was underfunded. In August of 1987, the trustees for Mid-America made several changes to the health care plan in an effort to cure the plan's financial problems. The trustees converted the plan into a Multiple Employer Welfare Arrangement under ERISA, 29 U.S.C. § 1002(40). The trust was renamed the National Business Association Trust ("NBAT").
 
 
 5
 After the meeting of the trustees, Glogower met with NBAT's Executive Director, Doug Walsh. The two men negotiated a new service agreement with NBA that expanded NBA's services to include underwriting and marketing. NBA's monthly fee was to be 20% of all NBAT employer contributions. The parties signed an Agreement for Plan Supervisor which gave NBA authority to handle the day-to-day affairs of NBAT. This included the ability to draw checks on NBAT's bank account in order to pay medical claims and to pay NBA's monthly service fee.
 
 
 6
 In marketing, NBA used the term "NBA Group" to refer to NBA, NBAT, Advantage Corporation, Advantage Medical Review Corporation, and Advantage Pharmaceutical. NBA owned stock in all of the entities referred to as NBA Group except for NBAT.
 
 
 7
 NBAT experienced much growth from 1987 to 1990. NBA's income from NBAT accordingly increased. For the fiscal years, NBA's gross revenue from Mid-America and NBAT was $151,952 in 1985; $120,744 in 1986; $195,507 in 1987; $1,096,026 in 1988; and $3,665,959 in 1989.
 
 
 8
 The increased revenue from NBAT partially accounted for Glogower's higher salary in 1989 and 1990. Glogower was not only being compensated for his unpaid salary from the prior years but he was also given a bonus to be used to repay money which he had borrowed from NBA. Included in the funds given to Glogower by NBA in 1989 and 1990 was $395,000 distributed to Glogower in response to four check requests he had made. Glogower had requested the money from NBA on forms developed by NBA to document its miscellaneous corporate expenses.
 
 
 9
 In late 1989, NBA began trying to acquire a "shell" insurance company. The seller required that an audit of NBA and NBAT be performed. James Terbeest, of Ernst & Young, began an audit which revealed that NBAT and NBA were not commingling money but that Glogower and NBA were. Terbeest was alarmed by the negative net worth of NBAT and refused to certify it as a "going concern." Because NBA needed a going concern opinion and would not be able to obtain one, Glogower ended the audit.
 
 
 10
 In the summer of 1989, NBA began receiving inquiries about NBAT from several state departments of insurance. The state of Georgia determined that NBAT was subject to its insurance laws and would have to comply. NBAT, however, could not do so as it had been operating on a claims-made basis and had not maintained any loss reserves as insurance companies are required to do. In October of 1990, Georgia issued a cease and desist order restraining NBAT and NBA from doing any business in the state except for paying claims. Similar orders were later issued by the states of Florida, Alabama, and Virginia. It was during this time that Glogower was receiving a large amount of funds from NBA in the form of unpaid salary and bonuses to repay loans he had received from NBA.
 
 
 11
 As a result of NBAT's financial problems, many employers withdrew from the plan, and new employers refused to join. In June of 1990, the Kentucky Department of Insurance placed NBAT in receivership. NBAT's collapse left many policyholders without insurance coverage and with unpaid medical bills. This ceased the business operations of NBA due to the loss of its major client and the surrounding publicity.
 
 
 12
 Ultimately, the collapse of NBAT was reported to have left 45,000 uninsured people across the country and between $12 million and $15 million in unpaid medical bills.
 
 
 13
 The publicity surrounding the collapse of NBAT placed blame in two directions: Andrew Glogower and the Kentucky Department of Insurance. Glogower was accused of charging NBAT an excessive rate and of mismanagement. The Kentucky Department of Insurance was blamed for not acting sooner when it was aware of NBAT's problems, thereby preventing further losses.
 
 
 14
 In 1991, Bruce Dunbar, the news anchor for WLKY-TV, Channel 32, which was owned by defendant Pulitzer Broadcasting Company, investigated the controversy surrounding NBAT and NBA. In the course of his investigation, he interviewed Patrick Watts, the general counsel for the Kentucky Department of Insurance. Mr. Watts told Dunbar that health care funds were taken from NBAT, given to NBA, and then distributed to Glogower. Watts showed Dunbar photocopies of Glogower's four check requests submitted to NBA totalling $395,000.
 
 
 15
 On May 8, 1991, the third segment of Dunbar's report entitled "Health Unsurance" was aired on Channel 32. The broadcast began with an interview of two sisters who had been left with unpaid medical bills as a result of NBAT's collapse. Dunbar proceeded to describe the collapse of NBAT as it was closed down by the Kentucky Department of Insurance. Dunbar reported that, at the time of NBAT's collapse, it had debts totalling $15 million and assets totalling only $890,000. Dunbar then interviewed Patrick Watts who explained that "money was drained from NBAT into NBA and then into the pockets of individual people." Appellant's Brief at 14. Dunbar stated that Glogower was one of those people and showed his picture on the screen. Watts then stated that Glogower had made check requests.
 
 
 16
 What followed was a series of four "mock checks" displayed on the screen, all payable to Andrew Glogower from NBAT, totalling $395,000. The first check dated October 6, 1989 was for $60,000. "None given" was listed as the reason for the check. Appellant's Brief at 15. The second check dated October 8, 1989 was for $130,000. "To be determined" was the reason given. Id. The third check dated December 5, 1989 was also for $130,000. "None given" was listed as the reason for the check. Appellant's Brief at 16. The fourth check was for $75,000 and was dated May 26, 1990. "A short term loan" was the reason given. Id. Dunbar then stated: "Altogether, Andrew Glogower got $395,000 of NBAT policyholders' money over a six month period." Id.
 
 
 17
 Dunbar reported that Glogower would not comment upon advice of counsel but that one of Glogower's attorneys had stated that the allegations could not be substantiated. The broadcast mentioned Glogower's wealthy lifestyle which included a Porsche sports car and a residence in an exclusive neighborhood. The broadcast concluded with teary-eyed allegations from one of the sisters that Glogower had her money.
 
 
 18
 Following the broadcast, pursuant to KRS § 411.061,[2] Glogower served a demand for correction upon WLKY-TV due to its directly false report that he had taken money from NBAT. Within the statutory time for response, WLKY-TV aired a correction on May 23, 1991. The correction stated in part:
 
 
 19
 [w]e incorrectly reported that Andrew Glogower, the chairman of the Board of NBA, Incorporated, withdrew $395,000 from National Business Association Trust, NBAT. In fact, Mr. Glogower withdrew $395,000 from National Benefit Administrators, Incorporated, NBA, another member of NBA Group.... Neither Mr. Glogower nor his attorney disputes the fact that thousands of policyholders were left with no coverage even though they had paid their premiums.
 
 
 20
 Appellant's Brief at 17. The broadcast also corrected the three errors it had made in the dates of the checks.
 
 B.
 
 21
 On May 24, 1991, plaintiff Glogower filed this diversity action seeking damages for defamation and false light against defendants Pulitzer Broadcasting Company, d/b/a WLKY-TV, Channel 32; Bruce Dunbar; and Patrick Watts.[3] On September 2, 1994, defendants filed a motion for summary judgment and for dismissal. The district court denied both motions.
 
 
 22
 The trial began on October 3, 1994. Plaintiff's case was based on evidence supporting the theory that NBA and NBAT were distinctly separate entities, that Glogower was paid money owed to him in back salary by NBA, and, therefore, defendants' allegations against him were defamatory. Defendants' case was based on evidence supporting the theory that the May 8, 1991 broadcast was substantially true because Glogower had caused NBA to overcharge NBAT, and Glogower then withdrew those funds from NBA. Defendants admitted that the graphics depicting the "mock checks" from NBAT were in error.
 
 
 23
 At the end of the trial, the district court instructed the jury that Glogower owed fiduciary duties to NBAT's policyholders. The district court also instructed the jury that substantial truth is a complete defense for defendants in this case, and, in deciding whether the broadcast was substantially true, the jury could consider NBA's fiduciary duties to NBAT's policyholders. On October 11, 1994, the jury returned a verdict for defendants. The jury's answers to its interrogatories were that the May 8, 1991 broadcast was substantially true and that the statements made by Watts were true. On October 13, 1994, the district court entered a final judgment for defendants.
 
 
 24
 On October 24, 1994, plaintiff filed a motion for a new trial which was denied by the district court on December 12, 1994. This timely appeal followed.
 
 II.
 A.
 
 25
 Plaintiff Glogower argues that the district court erred in the instructions it gave to the jury and that the judgment should be vacated and remanded for a new trial. While this is a diversity action, and Kentucky law governs the substantive law, federal law governs the standard of review applied to evaluate whether a jury instruction is prejudicial. Gafford v. General Elec. Co., 997 F.2d 150, 166 (6th Cir.1993). We will only reverse a judgment based on erroneous jury instructions if the instructions, "viewed as a whole, were confusing, misleading, or prejudicial." Beard v. Norwegian Caribbean Lines, 900 F.2d 71, 72-73 (6th Cir.1990). In reviewing jury instructions, we must look at them "as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." Id. at 72. A district court may not instruct a jury on an issue which is based on insufficient evidence. Jones v. Consol. Rail Corp., 800 F.2d 590, 592 (6th Cir.1986). Moreover, an instruction cannot require a jury to speculate about an issue which is unsupported by evidence. Bowman v. Koch Transfer Co., 862 F.2d 1257, 1263 (6th Cir.1988). Because the question of the correctness of jury instructions is a question of law, we review de novo a district court's jury instructions. See United States v. 37.29 Pounds of Semi-Precious Stones, 7 F.3d 480, 486 (6th Cir.1993) (stating that questions of law are reviewed de novo).
 
 
 26
 Plaintiff makes several arguments on appeal objecting to jury instruction numbers one and two.[4] Plaintiff argues that the instructions erroneously placed fiduciary duties on him that were in excess of ERISA's requirements, that the instructions on fiduciary duty were irrelevant, that the instructions improperly implied that a violation of fiduciary duties is equivalent to a direct conversion of NBAT funds, that the instructions improperly allowed the jury to consider whether the average viewer could distinguish between NBA and NBAT, and that the instruction on substantial truth was erroneous because the broadcast was directly false.
 
 
 27
 Pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 51, a party may appeal an objection to a jury instruction if the objection was made before the jury retired and the objection "state[ed] distinctly the matter objected to and the grounds of the objection." However, this court "generally requires a formal objection, which should in most circumstances be made both before and after the jury instructions are read to the jury." Woodbridge v. Dahlberg, 954 F.2d 1231, 1237 (6th Cir.1992). An exception is made when it is apparent that the trial judge was clearly aware of the objection and the party's specific grounds for the objection. Id.; Preferred RX, Inc. v. American Prescription Plan, Inc., 46 F.3d 535, 547 (6th Cir.1995). Furthermore, a party cannot assert one ground for its objection at the trial and then assert another ground on appeal. Libbey-Owens-Ford Co. v. Ins. Co. of North Am., 9 F.3d 422, 427 (6th Cir.1993).
 
 
 28
 A review of the record reveals that the only objection plaintiff asserts on appeal, that was formally made to the district court, is the objection that the district court should not have given an instruction on fiduciary duty.[5] Nor does the district court appear to have been aware of plaintiff's other objections and their grounds. Plaintiff argues that his submission of alternative jury instructions, which were rejected by the district court, followed by an objection from plaintiff, should preserve his arguments made on appeal to the extent that they are reflected in plaintiff's proposed instructions. However, offering a different instruction is insufficient notice to the district court and does not qualify as an objection preserved for appeal. Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir.1985). Accordingly, pursuant to Fed.R.Civ.P. 51, aside from the argument concerning the inappropriateness of the fiduciary duty instruction, plaintiff has waived review of his arguments except for plain error. Woodbridge, 954 F.2d at 1237. At an instruction conference with the district court judge on October 11, 1994, plaintiff objected to instruction number one and part of instruction number two, stating that "there is no need in this case to instruct the jury on fiduciary duty." J.A. 105-06. Thus, it is questionable whether plaintiff made the district court aware of his specific grounds for objection. However, we will address plaintiff's argument in the narrow context of relevance.
 
 
 29
 The essence of plaintiff's argument is that the broadcast accused Glogower of a criminal wrong and that the district court's instruction on fiduciary duty was irrelevant and improperly implied that defendant's accusations against Glogower could be justified by a breach of fiduciary duty, a civil wrong. However, the broadcast itself never specifically stated that Glogower had committed a crime. Instead the broadcast focused on the greedy behavior of Glogower at the expense of others, which could be interpreted as either a crime, a civil wrong, or both. As earlier stated, defendants' theory of the case was that Glogower's excessive withdrawals from NBA and his excessive fees from NBAT, combined with his daily control over the operations of both NBA and NBAT, protected defendants from a defamation charge because defendants' broadcast was substantially true; Glogower did end up with an excessive amount of NBAT's policyholders' money.[6] Plaintiff insists, however, that the fiduciary duty instruction misled the jury because, as both sides agree, the broadcast was false in that it stated that Glogower directly withdrew funds from NBAT. Glogower argues that under ERISA he did not have any fiduciary duties with respect to the amount of NBA's fee.
 
 
 30
 We will assume arguendo that Glogower is correct in his assertion regarding fiduciary duties under ERISA for fees. However, Glogower ignores the fact that through his position at NBA, he owed a fiduciary duty to NBAT in other respects; such as setting the amount of contributions, marketing the plan, and distributing the funds. Glogower's fiduciary duties are a relevant concern as evinced by defendants' theory of the case. Because the broadcast only accused Glogower of improper behavior and never specifically accused Glogower of a crime, the fiduciary duty instruction was not improper. As recognized by the Kentucky Supreme Court, "defamatory words must be measured by their natural and probable effect on the mind of the average lay [viewer] and not be subjected to the critical analysis of the legal mind." McCall v. Courier-Journal and Louisville Times Co., 623 S.W.2d 882, 884 (Ky.1981), cert. denied, 456 U.S. 975 (1982). Under that standard, the district court did not err in refusing to rely on the legal technicalities of whether the broadcast alleged criminal or civil misbehavior or both. It is doubtful that the average lay person made, or had the capability to make, that legal distinction when viewing the broadcast. Therefore, plaintiff's criminal-civil argument is misplaced.
 
 
 31
 Further, even if Glogower's fiduciary duties were "technically irrelevant" to this case, the district court's instructions "could not have misled the jury with respect to the basic issue involved"; namely, whether defendants' broadcast was substantially true. Lockridge v. Mercer, 438 S.W.2d 486, 488 (Ky.Ct.App.1968). As this court has recognized, instructions which correctly state the law but are inapplicable are not per se erroneous. Murphy v. Owens-Illinois, Inc., 779 F.2d 340, 345 (6th Cir.1985). Accordingly, we conclude that the instructions given to the jury regarding Glogower's fiduciary duties did not result in confusing, misleading or prejudicial jury instructions.
 
 
 32
 Regarding plaintiff's arguments which were not preserved for appeal, we conclude that they do not constitute plain error. As set forth in United States v. Olano, 570 U.S. 725, 113 S.Ct. 1770 (1993), there are four criteria to be used in determining whether to grant a remedy for arguments not raised at trial. First, there must have been an error. Id. at 1777. Second, the error must have been plain or obvious. Id. Third, the error must have affected substantial rights. Id. at 1777-78. Fourth, the plain error doctrine requires us to determine if the error below " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.' " Id. at 1779 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). On the whole, jury instructions number one and number two were not prejudicial to plaintiff. Moreover, plaintiff's argument that the average viewer instruction was erroneous, and plaintiff's argument that the substantial truth instruction was erroneous is simply wrong. See McCall, 623 S.W.2d at 884; Bell, 402 S.W.2d at 87. Therefore, we shall not disturb the judgment against plaintiff on the basis of the jury instructions.
 
 B.
 
 33
 Plaintiff also argues that the jury verdict was against the weight of the evidence and that the judgment should be reversed. However, plaintiff never raised this issue before the district court. As a general rule, unless there are exceptional circumstances, we will not address issues that are first raised on appeal. Foster v. Barilow, 6 F.3d 405, 407 (6th Cir.1993). While plaintiff made a motion for a new trial, his motion was only on the grounds that the district court had erred in its instructions to the jury. Plaintiff's failure to raise his challenge to the jury verdict as against the weight of the evidence in his motion for a new trial deprived the district court of ever addressing that challenge and, thus, prevents an appeal on those grounds. Dixon v. Montgomery Ward, 783 F.2d 55, 55 (6th Cir.1986). Accordingly, we will not review plaintiff's argument that the verdict was against the weight of the evidence as there are no exceptional circumstances indicating that the jury verdict was unreasonable.
 
 III.
 
 34
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 35
 BORMAN, District Judge, concurring.
 
 
 36
 I join Judge Milburn's excellent opinion in its entirety. I write to elaborate on one critical issue.
 
 
 37
 Federal Rule of Civil Procedure 51 states, in pertinent part:
 
 
 38
 No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.
 
 
 39
 Because Glogower's counsel failed to satisfy the requirements of Rule 51 with regard to the issue of a "fiduciary" instruction, the judgment of the trial court should be affirmed.
 
 
 40
 Plaintiff Glogower and his NBA organization had a fiduciary relationship to NBAT.[7] Glogower's brief on appeal, first at page 8, set forth the facts that established the fiduciary relationship, and then at page 26, conceded the existence of Glogower's and NBA's fiduciary relationship to NBAT.
 
 Appellant's Brief stated at page 8:
 
 41
 Under the Agreement for Plan Supervisor, NBA, as a practical matter, had complete responsibility for handling the day-to-day affairs of NBAT. All business records which were needed to carry out the operation of the Trust were kept at NBA's office. In addition, NBA had the contractual authority to administer the daily business operations of the Trust. This authority included the ability to draw checks on NBAT's bank account for medical claim checks and NBA's monthly service fee.
 
 
 42
 Thus, Appellant Glogower acknowledged the fact that he and NBA had the authority to withdraw money from NBAT's bank accounts.
 
 
 43
 The Glogower/NBAT brief, at page 26, stated: "There is no question that NBA was a fiduciary to the plan participants." The brief then sought to undermine the impact of this concession in the next two sentences, which I now set forth with the initial sentence for the purpose of completeness:
 
 
 44
 There is no question that NBA was a fiduciary to the plan participants of NBAT. Significantly, however, NBA was not a fiduciary for all transactions relating to the trust. To the extent that it was appropriate/proper for the trial court to have given any fiduciary instruction (at all), its failure to properly delineate the areas of fiduciary responsibility constituted reversible error. [emphasis in brief].
 
 
 45
 The simple fact remains that Appellant Glogower has conceded that he and his NBA operating entity occupied a fiduciary status toward NBAT.[8] While Appellant's brief then argued that his fiduciary status was limited, Appellant did not consistently argue that it was error to give a "fiduciary" instruction, but stated at one place, that "to the extent" it was appropriate/proper to give a "fiduciary" instruction, it should have properly delineated the specific areas of fiduciary duty. This scenario clearly leads to one conclusion: that having conceded the existence of a fiduciary relationship to NBAT, there was a heavy burden on Appellant to explain to the trial judge "loud and clear", and with specificity, (1) why it was error to give a fiduciary instruction and/or (2) the careful delineation that must accompany any such "fiduciary" instruction. The transcript of the jury instruction conference does not contain a specific argument by Glogower's counsel to the trial court that comes close to meeting this burden.
 
 
 46
 Rule 51, Fed.R.Civ.P. requires that the party objecting to an obstruction state "distinctly the matter objected to and the grounds of the objection." That was not done in this case.
 
 
 47
 Appellee Pulitzer's brief points out at page 7:
 
 
 48
 The Federal Civil Rules of Procedure and cases arising thereunder are quite clear in stating that a party complaining of error in jury instructions must properly object to the instructions to preserve the "error" for later appellate review, FRCP 51. A general objection to the instructions will not suffice for this purpose.
 
 
 49
 * * *
 
 
 50
 In order to properly preserve error arising from the instructions, a party must make a specific objection that sets forth the grounds for the objection. See Murphy v. Owens Illinois, Inc., 779 F.2d 340 (6th Cir.1985).
 
 
 51
 Appellant's claim that his objection to the "fiduciary" instruction satisfied the requirements of Fed.R.Civ.P. 51, is undercut by his appellate brief argument at page 26, set forth just prior to footnote 2, supra, by his subsequent argument at page 40, set forth, infra, and also by the transcript of the trial court's Jury Instruction Proceeding.
 
 Appellant's brief stated at Page 40:
 
 52
 Appellant first objected to the Court not giving his tendered instructions. Thereafter, Appellant objected to Instruction No. 1 on the ground "that there is no need in this case to instruct the jury on fiduciary duty."
 
 
 53
 * * *
 
 
 54
 This Court has recognized that submission of an inapplicable but legally correct jury instruction was not improper per se. Murphy v. Owens-Illinois, Inc., 779 F.2d 340, 345 (6th Cir.1985).
 
 
 55
 Asserting that there is no need to give an instruction does not provide the grounds for an objection.
 
 
 56
 At the trial court's Jury Instruction Conference on October 11, 1994, Plaintiff's Counsel stated as follows:
 
 
 57
 [W]e will object to Instruction 1A on, and take the position that there is no need in this case to instruct the jury on fiduciary duty.
 
 
 58
 * * *
 
 In reference to Instruction # 2
 
 59
 * * *
 
 
 60
 And then again just for the record we'd object to the reference to fiduciary duty.
 
 
 61
 Joint App. Pp. 125-26. Thus, it is clear that Glogower's trial counsel gave no specific grounds for the objection. The impact of that failure is compounded in this case. Since Glogower has conceded in his brief on appeal that he and his NBA entity were indeed fiduciaries toward NBAT, it was even more important that Glogower's trial counsel should have set forth to the trial judge his specific grounds for objecting to the fiduciary instruction.
 
 
 62
 Appellant Glogower's argument in its Reply brief, at page 11 acknowledged that trial counsel did not meet the requirements of Rule 51:
 
 
 63
 While it is true that Appellant did not articulate a specific objection to the excessive fiduciary burdens which Instruction No. 1 imposed upon NBA, that instruction should never have been given in the first place.
 
 
 64
 A leading treatise on the Federal Rules of Civil Procedure has stated:
 
 
 65
 Rule 51 expressly requires that the party objecting to any of the instructions to the jury state "distinctly the matter objected to and the grounds of the objection." The grounds must be stated with specific clarity so that the trial judge may follow and understand them if they are well taken. In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error.
 
 
 66
 Wright and Miller, Federal Practice and Procedure, 1995 Ed. Vol. 9A, Pp. 419-420.
 
 
 67
 In the instant case, Plaintiff's counsel failed to meet the requirements of Fed.R.Civ.P. 51 with regard to the "fiduciary" instruction issue. Accordingly, the judgment of the district court should be affirmed.
 
 
 68
 BOGGS, Circuit Judge, dissenting.
 
 
 69
 Because I believe that the district court's obviously improper jury instructions were sufficiently confusing to make a difference in this close case, I respectfully dissent.
 
 
 70
 The court assumes arguendo that Glogower did not have a fiduciary duty to the Trust to take a fee lower than the one negotiated by him and the Trust at arm's length. I agree with this "assumption" because I believe that the lack of such a duty is established ERISA law. Schulist v. Blue Cross of Iowa, 717 F.2d 1127, 1132 (7th Cir.1983). The court then concludes that Glogower's other fiduciary duties--to act in the best interests of the Trust's beneficiaries in matters other than his compensation--were "relevant as evinced by defendants' theory of the case." Opinion at 14. I do not see the relevance of Glogower's general fiduciary duties: Channel 32 never said Glogower was a bad manager in any sense except that he took too much money from the Trust.
 
 
 71
 The court's opinion, however, does not rest on the (erroneous, I believe) proposition that Glogower's actual fiduciary duties to the Trust were relevant to the case below. The court adds an alternative basis for affirmance even if Glogower's actual fiduciary duties were irrelevant. "Instructions that adequately state the law but are inapplicable are not per se erroneous." Opinion at 15. The court concludes that there was no chance that the instruction about these collateral fiduciary duties could have misled the jury as to the basic issue involved: the substantial truth of the broadcast.
 
 
 72
 Here I cannot agree. The court misses the chief effect of the district court's instruction about Glogower's fiduciary duty. The instruction was not limited to Glogower's actual fiduciary duties. It included by implication a fiduciary duty that did not exist--i.e., Glogower's duty to take only a reasonable management fee. The instruction as to fiduciary duty was very general, and did not tell the jury what sorts of duties Glogower did or did not have. The jury was simply told:
 
 
 73
 [O]ne is said to have a 'fiduciary duty' when the money or property which he handles is not his own or for his own benefit, but for the benefit of another person.... Glogower had the duty to act with the utmost fidelity and loyalty in managing the funds deposited by the policyholders....
 
 
 74
 ....
 
 
 75
 .... The fiduciary duty also imposed the responsibility to disclose any conflicts of interest which might make NBA and Glogower act in their own best interest at the expense and detriment of NBAT and its policyholders, including charges to NBAT and the use of the trust funds whether directly or indirectly.
 
 
 76
 Opinion at 10-11 n. 4. Given this instruction, it is likely that the jury believed that taking an unreasonably large management fee would be a breach of Glogower's fiduciary duty. Furthermore, because the evidence showed that Glogower's management fee was very large in relation to the success of the enterprise he ran, the probable final effect of the instruction was that the jury believed (erroneously) that Glogower broke the law.
 
 
 77
 Recognizing the full impact of the erroneous instruction, I cannot join in the court's holding that the instruction "could not have misled the jury with respect to the basic issue involved." Opinion at 15 (citing Lockridge v. Mercer, 438 S.W.2d 486, 488 (Ky.Ct.App.1968)). That holding seems to contradict nothing less than the words of the trial judge to the jury:
 
 
 78
 In considering whether or not the broadcast was substantially true you should consider the fact that NBA, Inc. had fiduciary duty toward the policyholders of NBAT.
 
 
 79
 Opinion at 11 n. 4 (emphasis added). There are two ways in which this instruction was misleading. First, it implied that the broadcast must have been substantially true if Glogower breached his imaginary duty. Given the strong evidence of what the jury could well consider overpayment, this aspect of the instruction was tantamount to a suggestion by the trial judge to decide the substantial truth issue in favor of the newspaper. Second, the instruction implied that once Glogower breached this non-existent duty, anything bad and vague that Channel 32 said about him would be acceptable. This aspect of the instruction told the jury to stop examining the facts once it concluded that Glogower violated this interpretation of his duty.
 
 
 80
 In other cases, where the trial result is clearly correct, it would be permissible to respond to potentially unfair jury instructions by turning the law's other cheek. My impression from the record, however, is that a jury that knew the real extent of Glogower's legal duties may well have decided that Channel 32's broadcast was not substantially true. Glogower did get a huge management fee from the Trust via his management company during the period immediately before the Trust's collapse. And thousands of people did lose medical insurance while Glogower, according to the trial evidence, enjoyed his large house and Porsche. However, an executive sometimes gets a "golden parachute" even though his own stupidity, negligence, or greed helped doom his employer; and the newspapers are full of accurate complaints about big paychecks to executives of failing companies. Glogower was not a thief--he never stole from the Trust, as the broadcast seemed to imply, nor did he break any fiduciary duty imposed by law.
 
 
 81
 Such differences in culpability are important under Kentucky libel law. See E.W. Scripps Co. v. Cholmondelay, 569 S.W.2d 700, 703 (Ky.Ct.App.1978) (where boy wrongfully struck other boy once on the head, an allegation of "savage beating" was not substantially true). Kentucky confines the doctrine of substantial truth to situations where there is no difference between the opprobriousness of the conduct reported and that of the conduct that actually occurred. Pearce v. Courier-Journal, 683 S.W.2d 633, 635 (Ky.Ct.App.1985) (applying doctrine of substantial truth where there is "no difference in the defamatory effect of a statement which imputes to a physician the illegal prescription of 'Demerol' and one which imputes the illegal prescription of 'controlled substances.' "). Accordingly, I would remand, asking a new jury if Glogower, who a jury might well think a scoundrel, is really the type of scoundrel that Channel 32 called him.
 
 
 
 *
 The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Glogower was paid $62,000 in 1985; $81,700 in 1986; $90,200 in 1987; and $15,330 in 1988
 
 
 [2]
 Under KRS 411.061, in an action for defamation, only special damages are recoverable when a radio or television broadcasting station issues a retraction following a demand from the plaintiff. Kentucky also follows the general rule that a retraction cannot constitute a defense to an action for defamation but can merely operate to mitigate the damages. Smith v. Smith, 178 S.W.2d 613, 614 (Ky.Ct.App.1944). Thus, in the present case, the significance of the retraction is only that it prevents punitive damages and may mitigate special damages
 
 
 [3]
 Mr. Watts is not a party to this appeal
 
 
 [4]
 Jury instruction number one reads as follows:
 NBA, Inc. and Glogower as its chief executive officer, had a fiduciary duty to NBAT and its policyholders. The court instructs you that one is said to have a "fiduciary duty" when the money or property which he handles is not his own or for his own benefit, but for the benefit of another person. This other person is in a relationship with him that requires great confidence and trust and a high degree of good faith. NBA, Inc. and Glogower had the duty to act with the utmost fidelity and loyalty in managing the fund deposited by the policyholders of NBAT.
 This fiduciary duty imposed a duty on NBA and Glogower to deal fairly and honestly with NBAT and its policyholders. The fiduciary duty also imposed the responsibility to disclose any conflicts of interest which might make NBA and Glogower act in their own best interest at the expense and detriment of NBAT and its policyholders, including charges to NBAT and the use of the trust funds whether directly or indirectly.
 J.A. 99. Jury instruction number two reads as follows:
 You must decide whether the broadcast of May 8, 1991 about the Plaintiff Glogower was substantially true. With respect to Defendants Pulitzer and Dunbar, substantial truth is a complete defense to an action for libel and false light. In considering whether or not the broadcast was substantially true you should consider the fact that NBA, Inc. had a fiduciary duty toward the policyholders of NBAT.
 You are instructed to answer this interrogatory and tell the court whether or not the broadcast concerning NBA was substantially true or was not substantially true. The court instructs you that to be substantially true, the broadcast does not need to be accurate as to exact facts or the most minute details of the transactions concerning Mr. Glogower, NBA and NBAT, but the law requires that the statements in the May broadcast be "substantially true."
 In answering the following question you may consider the effect of the broadcast on an average viewer and in doing so you may consider whether NBA and NBAT were so intertwined that the reasonable viewer would not make a distinction between NBA and NBAT.
 J.A. 100.
 
 
 [5]
 Plaintiff did object to the language in the third paragraph of instruction number two referring to the average television viewer, but plaintiff's objection to the district court was not that the instruction was erroneous. Rather, plaintiff argued, "I can understand why it should be in the instruction, but I believe it should be in the damage portion of the instructions and not in this portion of the instructions." J.A. 108. Because the grounds for the objection made in the district court are different from the grounds asserted on appeal, plaintiff did not properly preserve his argument that the average viewer instruction was erroneous. See Libbey-Owens-Ford Co., 9 F.3d at 427
 
 
 [6]
 Under Kentucky law, media defendants are entitled to the defense of "substantial truth" when charged with defamation. Bell v. Courier-Journal and Louisville Times Co., 402 S.W.2d 84, 87 (Ky.1966). "Substantial truth" means that the media is not required to report transactions correctly as to minute details and exacts facts. Id. Moreover, plaintiff did not object to the instructions on substantial truth
 
 
 [7]
 Glogower's brief on appeal at page 9, noted that Glogower and his NBA organization had created an operational marketing umbrella that included the entities of NBA and NBAT:
 With respect to marketing, NBA adopted the designation "NBA Group" to collectively refer to NBA, NBAT, Advantage Corporation, Advantage Medical Review Corporation and Advantage Pharmaceutical.
 This action by Glogower was likely to create confusion with regard to the status of the NBA and NBAT entities.
 
 
 [8]
 Glogower's and NBA's status as a fiduciary is appropriate under the language of the ERISA statute, 29 U.S.C. § 1002(21)(A):
 [A] person is a fiduciary with respect to a plan to the extent (i) he ... exercises any authority or control respecting management or disposition of its assets.
 Further, the Sixth Circuit stated in Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir.1988), that Congress intended that the term "fiduciary," as used in the ERISA statute, should be interpreted broadly.